IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

```
MARK VAUGHN,                   )
                               )
               Plaintiff,      )
                               )
      v.                       )     Case No.
                               )     04-4246-CV-C-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,            )
                               )
               Defendant.      )
```

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mark Vaughn seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ's residual functional capacity assessment is not supported by the evidence. I find that the ALJ properly discounted the opinion of Dr. Stone in his Medical Source Statement, properly discounted the opinion of Dr. Gutierrez in his Medical Assessment, and properly considered the opinion of Dr. Runde, the consulting physician. I further find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.  BACKGROUND

On February 24, 2003, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since February 11, 2001.  Plaintiff's disability stems from cervical pain, lumbar pain, extremity swelling, depression, and anxiety.  Plaintiff's application was denied on May 13, 2003.  On December 9, 2003, a hearing was held before an Administrative Law Judge.  On June 25, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On August 12, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 2 of 70

determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1.    Is the claimant performing substantial gainful activity?

>              Yes = not disabled.
>              No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>              No = not disabled.
>              Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

>              Yes = disabled.
>              No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

>              No = not disabled.
>              Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

>              Yes = disabled.
>              No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and documentary evidence admitted in connection with the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record indicates that plaintiff earned the following income from 1976 through 2001:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $    190.03 | 1989 | $ 7,120.85 |
| 1977 | 0.00 | 1990 | 12,950.00 |
| 1978 | 1,555.47 | 1991 | 13,515.09 |
| 1979 | 4,848.01 | 1992 | 14,097.85 |
| 1980 | 6,042.50 | 1993 | 15,886.92 |
| 1981 | 5,538.00 | 1994 | 6,947.49 |
| 1982 | 236.76 | 1995 | 1,684.66 |
| 1983 | 4,006.41 | 1996 | 6,951.52 |
| 1984 | 8,677.40 | 1997 | 8,225.75 |
| 1985 | 3,407.88 | 1998 | 4,039.17 |
| 1986 | 1,348.69 | 1999 | 12,996.69 |
| 1987 | 9,487.09 | 2000 | 7,904.02 |
| 1988 | 7,294.34 | 2001 | 2,685.29 |

(Tr. at 52, 56).

**Claimant Questionnaire**

On March 26, 2003, plaintiff completed a claimant questionnaire (Tr. at 84-87). He reported that any increase in daily activities, including playing with his children, makes his symptoms worse (Tr. at 84). When asked how often he has trouble with his symptoms, plaintiff wrote, "It

6

depends on how often I play with my children (but I will not deprive my two sons or daughter of the interaction with their father)." (Tr. at 84).

When asked how his impairment has affected his daily activities, he wrote, "I cannot play ball with my children as [illegible] as I or my children would like, but no matter what, I will continue to play with my children with which time hopefully several years from now, they need to interact with their father, it's very important for bonding purposes I strongly feel." (Tr. at 85).

Plaintiff reported that he is capable of taking care of himself and he requires no help shopping (Tr. at 85). He enjoys playing sports with his children but because of his neck pain he plays sports less frequently (Tr. at 86). He reads books, newspapers, and magazines (Tr. at 86). Plaintiff drives to the grocery store and to his kids' school functions (Tr. at 86). He has no difficulty using a phone, and he plays with his children "as much as possible -- i.e., baseball" (Tr. at 87).

**RFC Assessment by Counselor**

On May 13, 2003, a counselor from Disability Determinations, J. Nolte, completed a physical residual functional capacity assessment (Tr. at 71-78). The

7

counselor found that plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand, walk or sit for a total of six hours in an eight-hour day; and had an unlimited ability to push or pull (Tr. at 72). These findings were based on plaintiff's back x-rays and slightly decreased range of motion on May 9, 2003 (Tr. at 72). The counselor found that plaintiff could frequently climb, balance, stoop, kneel, and crouch, but could never crawl due to the limited range of motion in his cervical spine (Tr. at 73). The counselor found that while plaintiff's allegations are credible, "the subjective findings are greater than the objective findings in this claim." (Tr. at 76).

**Letter to plaintiff's counsel from ALJ**

On January 9, 2004, Administrative Law Judge James Seiler wrote a letter to plaintiff's counsel which states as follows:

> I held the record open subsequent to the hearing for the above-reference claimant so that you could submit additional evidence. You neither submitted such evidence nor sent a request for more time.
>
> If you do not send the evidence, request additional time, or satisfactorily explain why you cannot submit the requested evidence, within 10 days of the date of this letter, I will make my decision based on the available evidence.

. . . Attorney to submit office notes from Dr. Stone and Dr. Gutierrez.

(Tr. at 63).

**B.    *SUMMARY OF MEDICAL RECORDS***

Below is a summary of the medical records to the extent they are relevant and legible.

From October 30, 1994, until November 1, 1994, plaintiff was admitted at University Hospitals and Clinics, treated by Mark Stacy, M.D. (Tr. at 212-214). Plaintiff had been admitted for evaluation of a seizure witnessed at work. "The patient's wife reported that her husband had been instructed not to give any detailed information about seizures." Past Medical History: "A generalized personality disorder and dysthymia followed by Dr. Jones, psychiatrist, seizure disorder as noted above. History of drug abuse." Social History: "The patient started in a new job three weeks ago in Columbia Foods needing to work near heavy machinery. The patient was unable to get to work due to seizures. He was depressed about his seizures and inability to work. His wife has a history of bipolar manic disorder and he reported that she caused a great deal of mental stress for him. History of drug abuse in the past, Ativan dependent." Chest x-ray was unremarkable.

9

Electrocardiogram was unremarkable. Electroencephalogram was normal. Plaintiff had no seizures while in the hospital. He was discharged on Tegretol.

On April 19, 2000, plaintiff was seen at the University Hospitals and Clinics Emergency Center for a possible broken right hand after punching a wall (Tr. at 192).

On September 5, 2000, plaintiff saw Frederick Stone, M.D., for chronic neck pain (Tr. at 129-131). "Patient has worked in nursing for 18 years, but is no longer able to do this work. He is going back to school at Columbia College to study computers." Dr. Stone assessed chronic neck pain with muscle spasm, noted that plaintiff is a smoker, and noted that he had a somewhat depressed affect. He prescribed Vioxx, Percocet, and Skelaxin.

Plaintiff returned to see Dr. Stone on September 19, 2000, for a follow up (Tr. at 184). "Patient has tried to take it easy, but has several family responsibilities that make this difficult. He is a single parent, and has responsibilities for mowing the lawn around their house. Says that there is absolutely no one else who could help with this. Also is thinking about going to work. Loves nursing, and notes that Riverside Nursing Home would be eager to have him hired. . . . He has considered the

10

possibility of Disability.  He is planning to go back to school to study Psychology.  Patient was divorced in January of 1997 from his wife of 12 years.  They are back together, though still with some difficulties.  She has a strong history of manic depression, and used to be physically abusive.  Her symptoms are much better controlled on medication, and in fact she is finishing nursing school after this semester.  Her father was in the hospital recently with a diagnosis of colon cancer and sometime in the postoperative period suffered a stroke.  This has occupied much of the family's time, especially the wife's. Therefore, more of the child and household responsibilities are falling to the patient himself. . . .  Admits to some depression, though not interested in any medication or counseling at this time."  Dr. Stone assessed chronic neck pain and depression.  He increased plaintiff's Motrin to 800 mg. and continued his Skelaxin and Percocet.  "Discussed with the patient that his choices of mowing the lawn and considering going back to work at a nursing home where physical labor may be required will make it more difficult for us to control his pain.  He understands this, but sees that there are few alternatives for his family's welfare."

11

On October 12, 2000, plaintiff returned to see Dr. Stone for a follow up (Tr. at 183). "Has not been particularly vigorously active lately, does not think that this has improved things either. He reemphasizes that he is going to need to be able to do some things simply to support his family. For instance, his wife is working the evening shift, so he needs to be able to drive the kids to some activities after school. Also, the family is using a wood stove in order to save money on electricity, and this necessitates chopping some wood."

Dr. Stone assessed chronic neck pain. "The Percocet seems to be allowing the patient to have increased level of function which he needs for his family." He noted that plaintiff's depression was stable. "Discussed with patient that he will be the best arbiter of how much he can do with only mild to moderate exacerbation of pain which he finds tolerable. . . . Also discussed with patient concerns about the possibilities of addiction or dependence on a narcotic such as Percocet. . . . Letter written on prescription form saying that the patient was unable to work this past month. This is for a caseworker who has been involved with the family getting food stamps this past month."

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 12 of 70

On November 21, 2000, plaintiff saw Dr. Stone for a follow up (Tr. at 182). "He is having to do lifting of patients. Also did chopping of wood at home." Dr. Stone assessed chronic neck pain. "Patient remaining functional on Percocet." He noted depression with improved symptoms.

On December 5, 2000, plaintiff returned to see Dr. Stone (Tr. at 179-181). He complained of nasal congestion and cough. "Has a six day history of worsened neck pain and upper lumbar back strain. Continues to work at Riverview Nursing Home. Has recently worked 12 days in a row. Was by himself and had to lift a 430 lb. patient from the chair. . . . The patient feels like he has no choice but to work. Patient's wife also works at Riverview Nursing Home though has missed quite a bit of work due to increased depression symptoms. He has worked some of her shifts for her." Dr. Stone assessed acute sinusitis, noted continued cigarette smoking, chronic neck pain, upper lumbar back strain, continued symptoms of depression. He prescribed Flexeril and MS-Contin [morphine].

Plaintiff saw Dr. Stone for a follow up on December 21, 2000 (Tr. at 178). "Continues to do quite a bit of lifting at work at Riverview Nursing Home. He is anticipating taking some kind of test in February that will enable him to

13

be credentialed to pass medications. If this comes to fruition, he is hoping then to be relieved of much of the lifting duties. As before he discusses the thought of little practical choice in the matter. Needs to work for his family. Also has been doing some chopping wood with the cold weather. He notes that if the family was to buy wood, it would cost about $600.00 a month, this is money they do not have." Dr. Stone assessed chronic neck pain, improvement with MS-Contin. Depression overall stable.

On January 11, 2001, plaintiff saw Dr. Stone for a follow up (Tr. at 177). "Notes that he is still doing considerable lifting of patients. At times they are very short staffed, or there might be one other person on duty who is a small person and cannot do the heavy lifting by herself. He requests a note that might be put in his file at work indicating that his neck pain is of chronic nature and that there may be times where exacerbations prevent him from doing his full duties. Will be taking a 6-week course and a test beginning in February of this year in order to be able to pass medications. Once he has passed this exam and is recertified to pass medications this will become his primary responsibility. He notes that other charge nurses at the facility who pass medications typically do no lifting

14

at all.  He expects that in that new role he might do an
occasional lifting to help someone else out, but it will not
be his primary responsibility."

Dr. Stone assessed chronic neck pain, some relief with
pain medications.  "Note written for patient to keep on his
file at work."

On February 6, 2001, plaintiff saw Dr. Stone for a
follow up (Tr. at 176).  "Does not feel like things have
gone well over the last month.  Patient has been having more
pain as a result of continuing work.  He has been missing
more days of work as a result.  Also, he says that only two
of the seven people passed some kind of preliminary exam
that was going to [influence] the nursing home decision to
offer the class required for people to be able to pass
medicines.  With so few passing the initial exam they will
not be offering this course anytime soon, and therefore, the
patient does not have an anticipated alternative to current
floor work which involves considerable ongoing lifting.  The
patient's wife recently quit her job.  She continues to have
ongoing psychiatric issues. . . .  Since she has quit her
job he is worried that he is going to have to get an
additional job to help make ends meet for the family."

15

Dr. Stone assessed chronic neck pain and spasm. "These
are exacerbated by patient feeling like he must continue to
work, and not having alternatives to physical lifting of
patients on a frequent basis." Dr. Stone recommended
plaintiff see an anesthesiologist specializing in chronic
pain management. "Patient not keen on the idea". He
increased plaintiff's MS-Contin, and refilled his MSIR
[morphine].

February 11, 2001, was plaintiff's alleged onset date.

On February 15, 2001, plaintiff saw Dr. Stone (Tr. at
174-175). Plaintiff reported having more problems at work.
"Had to leave work early on two different occasions.
Patient is concerned about his supervisor's lack of
understanding. . . . He has placed a call in and is
expecting a call back tomorrow regarding the possibility of
disability." Dr. Stone assessed chronic neck pain, relieved
with MSIR and Valium; depression with some exacerbation of
symptoms given his situation. "Long term: this patient
needs to get out of a nursing role that involves much
physical labor. Whether he finds a different niche in
nursing, or pursues something else such as psychology, it is
unlikely he is going to be able to continue doing the heavy
lifting for much longer despite whatever medications we

16

might try.  Filled out work form related to more specific restrictions than previously mentioned in my handwritten note."

Dr. Stone increased plaintiff's MSIR and Valium.  He also completed a Return to Work Recommendation stating that plaintiff could return to work on February 18, 2001, in a light work capacity lifting 20 pounds maximum.  Plaintiff could stand or walk for six to eight hours, could use his hands for single grasping, fine manipulation, pushing and pulling.  Should do no bending, squatting, climbing, twisting, or using power tools.

On February 26, 2001, plaintiff returned to see Dr. Stone (Tr. at 173).  "The patient quit his job at the nursing home last week.  Overall feels that this is the right decision, though it creates other problems for him and the household.  He is not currently working any place.  He has talked with some official regarding the possibility of temporary disability which would allow him to go back to school."  Plaintiff reported he was using MS-Contin 30 mg. and occasionally takes 45 mg. at bedtime but did not think the extra 15 mg. was helpful.  "Has found the MSIR to work very well."  He also found the Valium helpful for relaxation of the muscles.  Observation:  "Middle-aged, white gentleman

17

in no acute distress." Dr. Stone assessed chronic neck pain and back pain. "Currently pain control regimen seems adequate." He also assessed depression, somewhat improved. "Candidate for temporary disability. This patient should not engage in physical labor, however with some further education or retraining he should still be able to be a productive member of the work force. He is interested in finding a niche in the employment world and has wanted to go back to school for a long time." He refilled plaintiff's prescriptions for MS-Contin, MSIR, and Valium.

On March 23, 2001, plaintiff returned to see Dr. Stone (Tr. at 172). Plaintiff reported that he continued to have neck pain. "Has had to do some wood chopping lately." Dr. Stone assessed chronic neck pain, gave prescriptions for MS-Contin and MSIR.

On April 20, 2001, plaintiff returned to see Dr. Stone for continued neck pain (Tr. at 171). "Patient very frustrated with living with his chronic pain. Phone at home has been disconnected. Patient's wife is now working again, though he is not sure how long she will be able to do this." Observation: "Middle-aged, white gentleman in no acute distress. Occasional flashes of anger regarding his circumstances and situation." Dr. Stone assessed chronic

18

neck pain and continuing depression.  He decreased
plaintiff's MS-Contin, and increased his MSIR.

On May 3, 2001, plaintiff returned to see Dr. Stone for
a follow up (Tr. at 170).  "The patient continues to have
significant family stress."  Dr. Stone diagnosed depression.
"Patient is confident that he will be able to handle the
exacerbating issues on his own."  Stopped Morphine, began
Oxycodone.

On May 25, 2001, plaintiff saw Alan Hillard, M.D., for
chest x-rays (Tr. at 110).  "Two view chest x-ray, compared
to 1/17/96 again demonstrates an old rib fracture on the
sixth rib on the left.  The lungs are clear.  The heart and
mediastinum are unremarkable.  Hyperinflation of the lungs
is seen with probable underlying COPD [chronic obstructive
pulmonary disease]."

On May 31, 2001, plaintiff saw Dr. Stone for a follow
up (Tr. at 169).  "The patient saw Dr. Conway of P.M.&R.
[Physical Medicine & Rehabilitation] yesterday.  Was not
satisfied with visit.  Physical therapy including TENS unit
recommended by Dr. Conway.  Patient says he has done this in
the past and did not find it helpful. . . .  Had been doing
some per diem work for a while, but not recently working.
Has an appointment on June 5 with Vocational Rehabilitation.

19

He has some computer literacy, and it looks [like] they will work out a plan involving this. Patient aware that he should try to find another line of work that [will] allow him not to do any heavy lifting. Patient finding the OxyContin somewhat helpful, though has had some breakthrough pain occasionally. Wonders about using the MSIR again for breakthrough pain."

Dr. Stone assessed chronic neck pain, "physical therapy recommended. Pain control fairly adequately." Depression, probably exacerbated by recent events. "Confronted patient with anonymous phone message of 5/17/01. Patient denies selling any of his medication or using it inappropriately. Has an idea that his stepson may have been the one to make the call." Dr. Stone refilled plaintiff's Valium, continued him on Oxycodone, decided to allow MSIR. "Will await formal evaluation from Dr. Conway before deciding on how strongly to push the patient toward accepting physical therapy recommendation again."

On June 25, 2001, plaintiff returned to see Dr. Stone (Tr. at 168). Neck pain continues to be about the same. He continued plaintiff on Oxycodone, MSIR, and Valium; also prescribed Neurontin.

20

Plaintiff saw Dr. Stone on July 23, 2001, for a follow up on his neck pain (Tr. at 167). "Has talked with the Vocational Rehabilitation counselor and they have talked about training him for x-ray technician. . . . Family is moving to Fulton this week and the patient has been moving things himself. . . . Also recently one of their cars caught on fire and he had to push it quickly out of the garage." Assessed chronic neck pain, pain control adequate. "Some activities exacerbate it on an occasional basis, though no overall worsening of symptoms. . . . Discussed with patient that being an x-ray technician probably would not be a good job as it would involve considerable lifting and transferring of patients. . . . Encouraged him to stop by one of the college libraries to look at their career counseling books."

On August 21, 2001, plaintiff returned to see Dr. Stone (Tr. at 166). Plaintiff complained of continued problems with neck and back pain. "Pain especially in the neck region with having to move. Got this accomplished but he put himself on bed rest for a couple of days. . . . Has been able to make contact with the social worker at Vocational Rehabilitation. He is going to be starting drafting classes. He did some of this earlier on and

21

enjoyed it and thinks it will make for a reasonable career change.  He is also out interviewing for two jobs at this time.  May involve some lifting but he would take it if it is the only [one] offered."  Dr. Stone assessed depression, overall stable.  He discontinued plaintiff's Oxycodone and Neurontin, resumed MS Contin, 30 mg., refilled MSIR and Valium.

On October 9, 2001, plaintiff saw Dr. Stone for a follow up on his neck pain (Tr. at 165).  Plaintiff stated he believed the MS-Contin has been helpful.  "Has been making progress through the Vocational Rehabilitation system.  Has had the required psychological testing.  Is considering which options he might want to pursue.  Might want to do drafting, though has not definitely settled on this.  Patient's wife bought him a slightly used wood working machine.  Patient very much enjoys doing wood work and has a shop in the house that they are renting where he can do this kind of work.  Might be interested in making some products for sale such as coffee tables.  Sounds very pleased with this kind of possibility."  Observation: "Middle-aged, white gentleman in no acute distress." Assessed chronic neck pain; depression, somewhat improved. "Plans for a new lifestyle course in Vocational

Rehabilitation seems to have uplifted this patient. Also seems to get great joy in doing some wood working."

Dr. Stone increased plaintiff's MS-Contin to 45 mg., refilled his MSIR, and refilled his Valium.

On January 3, 2002, plaintiff returned to see Dr. Stone (Tr. at 164). Over the Christmas holiday, plaintiff had severe nausea and vomiting. "Requests refills on morphine medications, but by contract it would be a little early." Dr. Stone gave plaintiff refills on MS-Contin 30 mg., MS-Contin 15 mg., and MSIR, all forms of morphine.

On February 4, 2002, plaintiff returned to see Dr. Stone (Tr. at 163). Neck pain has been stable. "Is finding the pain medication regimen generally helpful. . . . Patient indicates in part he is probably learning to live with the pain, and still try to remain functional. Is still working with Vocational Rehab to make alternative career plans. Has not worked out at his workshop as much because of the cold weather recently. This workshop is not heated. Patient overall feels that the pain, while present, is not at all as intolerable as it has been in the past. Is still smoking, but is now smoking less than one pack of cigarettes per day." No swelling in extremities. Observed that plaintiff walks with a normal gait. Dr. Stone assessed

23

chronic neck pain, adequately controlled; associated muscle spasm, controlled with Valium; continued cigarette smoking, though working on cutting down. He refilled plaintiff's Valium, MS-Contin, and MSIR.

On February 14, 2002, plaintiff returned to see Dr. Stone (Tr. at 162). He complained of feet, ankle, and lower extremity swelling up to knees for the past four days. Plaintiff's weight had increased from 169 to 208 pounds. "He just recently bought himself some motorcycle boots and was concerned that they're too tight."

On March 22, 2002, plaintiff saw Dr. Stone after having fallen down six to eight basement steps the day before (Tr. at 161). X-ray films were negative for fracture to the shoulder or dislocation. Observation: "Middle-aged, white gentleman in no acute distress." Dr. Stone assessed contusion to the left shoulder and chronic neck pain exacerbated by the fall. He gave plaintiff Relafen and additional MSIR to use over next one to two weeks.

On April 1, 2002, plaintiff saw Yash Sethi, M.D., for chest films, two views of the chest, three films (Tr. at 109). Dr. Sethi noted, "Heart size is normal and lungs clear, old healed left 6th rib fracture."

24

On May 1, 2002, plaintiff returned to see Dr. Stone (Tr. at 155). "Control of chronic neck pain has been satisfactory of late." Observed: "Middle-aged, white gentleman in no acute distress." He assessed chronic neck pain adequately controlled.

On July 17, 2002, plaintiff saw Dr. Stone and complained that he had been having more neck pain lately (Tr. at 154). "Has been working construction. Indicates that he needs to do this to help the family make ends meet." Observation: "Middle-aged, white gentleman in no acute distress." Assessed chronic neck pain, likely exacerbated by recent construction work activities. "Discouraged the patient from continuing with construction work, as it will only make his chronic pain worse."

Plaintiff again saw Dr. Stone on August 2, 2002 (Tr. at 153). Plaintiff reported that his neck pain and back pain continue about the same. "Patient is anticipating getting a new job that will involve only light lifting on an occasional basis." Assessed chronic neck pain with muscle spasm. Plaintiff reported that Valium is helpful for muscle spasm, although not lasting eight hours. Dr. Stone refilled plaintiff's MS-Contin and MSIR. "Encouraged the patient to

25

seek work in a job that would not be as physically demanding as some of his previous jobs have been."

On August 13, 2002, plaintiff saw Dr. Stone after plaintiff accidentally stepped off the curb wrong and suffered an inversion injury to his left ankle (Tr. at 152). Dr. Stone assessed left ankle sprain and told plaintiff to take Aleve as needed.

Plaintiff returned to see Dr. Stone on September 3, 2002 (Tr. at 151). "Patient has been having more problems with breakthrough pain lately. Has had poor sleep over the past two nights. Has been doing sheet rock work, which does require lifting. Tries to use his legs as much as possible, though causes strain on his back. Patient knows my recommendation against heavy physical labor given his medical condition, however, he replies that he does have to work to provide for his family. Wife is not currently able to work. Patient is looking at a couple of jobs in Columbia that pay well. The one that pays the best would require frequent lifting of 50 to 100 pounds. Patient indicates that going back to school is not an option at this time due to timed family constraints." Assessed chronic neck pain. "Patient would still be reluctant to see an anesthesiologist for chronic pain management since he is not agreeable to any

26

needle injections. . . . Also discussed with patient that
his continued insistence on physical labor continues to
exacerbate his chronic pain. He acknowledges this. I will
agree with him that he does have to somehow be able to
provide for his family, and if his job skills require
physical labor then that is what he is going to have to deal
with." Dr. Stone increased plaintiff's MS-Contin and
continued his MSIR.

On October 2, 2002, plaintiff returned to see Dr. Stone
(Tr. at 150). Neck pain continues to be about the same.
"Patient is currently staying at home now taking care of the
family. Patient's wife continues to have significant health
problems of her own, and is not able to work outside the
home or do much for the family right now." Observation:
"Pleasant, middle-aged white gentleman in no acute
distress." Assessed chronic neck pain "overall fairly well
controlled". Continued plaintiff on MS-Contin and MSIR.

On October 16, 2002, plaintiff saw Herman Andrew Damek,
Jr., M.D., who appears to be associated with Dr. Stone (Tr.
at 149). Plaintiff complained of foot and leg swelling for
the past three days. "From examination today it seems like
it is resolving on its own. . . . Patient counseled to try
Benadryl next time this occurs."

27

On October 31, 2002, plaintiff returned to see Dr.
Stone (Tr. at 148).  Plaintiff continued to have problems
with neck pain, medications were overall fairly helpful.
Observation:  "Pleasant, middle-aged white gentleman in no
acute distress. . . .  Hands and ankles without edema
today."  Assessed chronic neck pain, overall reasonably
controlled; peripheral edema with recent recurrence now
resolved, etiology unclear.  He refilled plaintiff's MS-
Contin and MSIR.

On November 26, 2002, plaintiff returned to see Dr.
Stone (Tr. at 147).  Plaintiff reported that he had been
having more problems with neck pain.  "Despite the increase
of MS Contin two months ago, patient is still having
considerable break through pain.  Has been doing some
moderate physical labor and has been doing some household
painting and washing of windows for his landlord.  This
helps to reduce the family monthly rent, which is helpful.
With this physical activity, the patient has had more
problems with hand edema and pain."  Assessed chronic neck
pain exacerbated by the cold weather and physical activity.
"Despite all of this, the MS Contin has probably proved [as]
helpful a regimen as anything we have tried over two years
time."  Dr. Stone increased the MS-Contin, refilled the

28

MSIR. "Patient considering disability. This is reasonable, however, patient would be excellent candidate for Vocational Rehabilitation that would give him skills to work in non-physically demanding ways."

Plaintiff returned to see Dr. Stone on December 26, 2002 (Tr. at 146). Neck pain has continued about the same. Medications are helping. "Patient is interested in pursuing the disability evaluation. However, he would like to defer the exam until follow up visit in early January. Patient has a step-son who has been in serious trouble with the law, and the patient is upset about this. . . . Mildly pressured speech when discussing his step-son's problems, however, otherwise normal mood." Assessed chronic neck pain, adequately controlled.

On January 6, 2003, plaintiff saw Dr. Stone for a disability physical (Tr. at 145). "Patient's chief reason for seeking Disability is chronic neck pain. . . . Has required chronic narcotics to help with pain, and this has only provided partial relief. Also using Valium to help with muscle spasm. . . . Has also had some moderate low back pain that can be chronic and intermittent in nature. This has been less bothersome than the neck pain. It does not contribute significantly to current disability

29

situation. Patient has had no problems lately with swelling of the hands or feet." Assessed chronic neck pain with much decreased range of motion. No particular limitation of physical activity, though physical activities in general aggravate the neck pain. Low back pain that is moderate in nature and not significantly disabling. Ordered x-rays of back and hands. Increased Valium, filled out disability form.

On January 9, 2003, plaintiff saw Jamey Wright, M.D., for x-rays (Tr. at 107-108, 121-122). X-rays of cervical spine, seven views. Impression:

1. Spondylitic changes, especially C5-6 and C6-7 with some spurring also suggested at C3-4. Patient may benefit from MRI for assessment of stenosis and neural impingement.

2. Suspect no acute fracture or subluxation.

X-rays of the left hand, three views. Impression: Negative for bony injury.

X-rays of right hand, three views. "There is a chronic appearing deformity at the proximal aspect of the fifth metacarpal. Suspect remote prior trauma." Impression: Suspect prior trauma proximal right fifth metacarpal.

On January 24, 2003, plaintiff returned to see Dr. Stone (Tr. at 144). Neck pain about the same, medications

30

are somewhat helpful. "Gets frustrated with dealing with chronic pain. Would like things to be different. However, denies any particular depression symptoms. Regarding chronic neck pain, the patient would be reluctant to undergo any surgery, even if a surgeon recommended it."

Observation: "Generally pleasant, middle-aged, white gentleman in no acute distress." Assessed chronic neck pain with findings on x-rays of degenerative disk disease, disk space narrowing. "Probable mild depression, though patient would deny this." Dr. Stone continued plaintiff on his medications, "no further evaluation of neck pain at this time." Refilled MS-Contin and MSIR.

On February 24, 2003, plaintiff filed his application for disability benefits.

On February 28, 2003, plaintiff saw Dr. Stone for a follow up (Tr. at 143). "Disability paperwork is in processing." Dr. Stone observed, "Pleasant, generally healthy-appearing, middle-aged, white gentleman in no acute distress." He assessed chronic neck pain and continued plaintiff on MS-Contin and MSIR.

On March 26, 2003, plaintiff returned to see Dr. Stone (Tr. at 142). Neck pain was about the same. Rain and cold weather tend to aggravate the pain. "MS-Contin is probably

31

helpful.  Patient finds the MSIR more helpful."  Plaintiff
reported that when he drives more than about 20 miles, his
pain is aggravated.  "Has been smoking some.  No new
concerns.  Disability determination is still pending."
Observations:  "Generally healthy, pleasant, middle-aged
white gentleman in no acute distress."  Assessed chronic
neck pain.  Continued MS-Contin and MSIR.

On April 25, 2003, plaintiff returned to see Dr. Stone
(Tr. at 141).  Plaintiff had been receiving acupuncture for
chronic neck pain.  "Has been finding it significantly
helpful."  Currently smoking a pack of cigarettes every two
to three days.  "Is interested in quitting completely, but
not ready to set a quit date."  Observations:  "Generally
healthy, pleasant middle-aged white gentleman, no acute
distress."  Plan:  "Discussed with patient that continued
smoking will interfere with general efforts to manage
chronic pain."  Dr. Stone refilled plaintiff's MS-Contin and
MSIR.

On May 9, 2003, plaintiff saw Eddie Runde, M.D., of
Occupational and Environmental Physicians, P.C. (Tr. at 113-
116).  The report reads in part as follows:

32

HISTORY:
. . . His driver's license has an expiration date of
10/16/05. . . . He states that his wife does not
drive.

The examinee is here for a physiatric examination and
report. The examinee apparently has allegations of
spondylosis in his neck for which the examinee has
applied for SSA disability benefits. . . .

In 1998, he was hit by a car while he was riding his
bicycle. . . . Three or four years ago, he was sitting
in his car at a stop sign when someone hit his car from
behind. The other car was going about 45-50 mph. . . .
In 1999, he slammed on his brakes to miss hitting a
deer. This resulted in him hitting his nose on the
steering wheel. . . . Dr. Stone has recommended that
he apply for Social Security Disability.

He also reports that his left foot goes numb, without
provocative activities. . . . He also has similar
symptoms in his left hand. . . . Again, he has no
exacerbating or ameliorating factors known. . . .

Social History: He likes to "do activities [with] my
children" in his free time. . . .

**Oswestry Low Back Pain Disability Questionnaire.** He
scores a 30/50, which can be interpreted as a 60%
perceived disability due to LBP [lower back pain].
(However, most of his pain is in his neck and the
validity of this interpretation is inadequate at best.)
This perceived pain level may be consistent with
observed behavior during the history and physical
examination.

**Short-form McGill Pain Questionnaire**. His somatic
score is 12/33 and his affective score is 5/12. This
may suggest an important affective component to his
pain perception.

**Beck Depression Inventory**. He scores a 9/51 due to not
answering questions 5, 13, 15 and 17. This would be a
score of 17.6% and would approximate a score of 11/63.
This would be consistent with a mild mood disturbance

33

(0-10 is considered normal, 11-16 is considered a mild mood disturbance). A low level depression is common in people who have a chronic illness, including chronic pain syndromes. However, individuals with the levels of pain he reports and demonstrates typically have higher levels of depression.

PHYSICAL EXAM:

. . . The examinee is able to dress and undress slowly without assistance. The examinee slowly gets onto and off the table without assistance. . .

**Mental Status**: The examinee is alert and fully oriented, in no acute distress. His affect is flat and depressed. He became tearful at the end of the examination (when he was told that driving with his restricted cervical range of motion was not safe).

. . . The examinee is able to oppose all fingers and make a fist. The examinee is able to do fine finger movements as demonstrated by rapidly opposing all fingers sequentially.

**Grip strength**: The examinee seemed to give an inconsistent effort with grip strength testing. Grip strength was 4/5 in each hand by manual testing. . . . Neither of his curves approximate a bell-shaped curve, suggesting poor effort. He did complain of left shoulder pain with left grip testing at position 1. However, he did not report pain with other grip positions, making it more challenging to attribute the poor effort to pain. . . .

**Lumbar spine**. . . . He had no lumbar spine complaints today. . . .

DIAGNOSES:
1) Degenerative cervical spine disease with spondylosis
2) Chronic pain syndrome
3) Subjective greater than objective findings
4) Probable deconditioning syndrome
5) Possible narcotic and benzodiazepine dependence

34

WORK STATUS/RESTRICTIONS:
Subjectively, the examinee would suggest he cannot do
anything.  However, the following are based upon the
objective findings noted above:
1)    He should be able to lift or carry up to 25 pounds
      frequently.  (After conditioning and physical
      rehabilitation for his neck pain, he should be
      able to lift/carry more.)
2)    He has no restrictions for pushing or pulling with
      his upper or lower extremities.
3)    He has no limits to climbing, balancing, stooping,
      kneeling or crouching.
4)    Due to his limited ranges of cervical range of
      motion, he should not crawl.
5)    Due to his limited ranges of cervical range of
      motion, he should not drive.  Using the
      recommendations for commercial drivers, he needs
      to have at least 40° cervical rotation to be able
      to safely operate a motor vehicle (car, truck,
      van, etc.).
6)    If these recommended restrictions can be
      accommodated, he should be able to sustain a 40-
      hour workweek on a continuous basis.

On May 15, 2003, plaintiff went to Callaway Community

Hospital complaining of respiratory distress, increased

shortness of breath and cough for three days (Tr. at 119-

120).  X-rays of the chest reflected no acute disease in the

chest.  The doctor diagnosed asthma, stable; oxygen

saturation much improved with treatment.  Plaintiff was

prescribed Albuterol and cough syrup as needed.

On May 23, 2003, plaintiff's application for disability

benefits was denied.

On May 28, 2003, plaintiff returned to see Dr. Stone

(Tr. at 140).  Plaintiff reported that he recently went to

35

the emergency room for shortness of breath, received three high-flow nebulizer treatments there and an injection of Solu-Medrol. He was given a prescription for Prednisone and Albuterol. He recently resumed smoking. "Patient's neck pain continues to be bothersome. Does find the medication somewhat helpful. As on some previous visits, patient wonders if there would be other medications that would work better. Patient does not want to try Fentanyl." Observation: "Generally healthy, middle-aged, white gentleman in no acute distress." Assessed chronic neck pain, overall stable. "Medications probably providing overall satisfactory relief at this time." Continued plaintiff on MS-Contin and MSIR, encouraged him to quit smoking.

On June 27, 2003, plaintiff returned to see Dr. Stone (Tr. at 139). "Has been having more problems with reflux symptoms at night. Having trouble lying flat. Has had to sleep in the recliner more. . . . Patient was out of town in the Kansas City area. . . . Continues to see Dr. Gutierrez who prescribed the Xanax. Believes that the Xanax has been helpful for anxiety. Dr. Gutierrez is not aware that we have been prescribing Valium. . . . Still smoking, but says he is doing so rarely now." Plan: "He does not

want an EGD[1] at this time so will continue with over the counter Zantac. . . . Patient is on high dose Xanax and Valium. He has been on both of these probably since we unknowingly prescribed the Valium which was added to the Xanax he was already on. . . . Fortunately, the Benzodiazepines are safe medications so he is not likely overdosing on these medications if using them as prescribed. . . . Encouraged the patient to discuss his full medication list with Dr. Gutierrez." Dr. Stone refilled plaintiff's MS-Contin and MSIR.

On August 18, 2003, plaintiff saw Nemesio E. S. Gutierrez, M.D., a psychiatrist (Tr. at 126). "Last seen 3/10/03. Wants to taper off Xanax. Applied for disability again. Lawyer hired. Reports 'stress seizures.'" Observations: mood - neutral. Affect - worried. Goal oriented.

Dr. Gutierrez assessed panic disorder, general anxiety disorder, major depressive disorder. He prescribed Remeron 45 mg, stopped Lexapro because plaintiff reported that it did not do anything, and decreased Xanax.

---

[1]Esophagogastroduodenoscopy, also known as an upper endoscopy, is an examination of the lining of the esophagus, stomach, and upper duodenum with a small camera (flexible endoscope) which is inserted down the throat.

On August 26, 2003, plaintiff returned to see Dr. Stone (Tr. at 138). Plaintiff was "generally doing about the same. Pain medications are generally helpful for the most part. Disability process is still ongoing." Dr. Stone assessed chronic neck pain, adequately controlled; gastroesophageal reflux disease, controlled with over the counter Pepcid; Anxiety, stable. He refilled plaintiff's MS-Contin and MSIR.

On September 18, 2003, plaintiff returned to see Dr. Gutierrez (Tr. at 127). "Takes care of kids, says he is doing fine - happy things at home - getting along with wife or ex wife". Observations: mood - good affect, full, occasionally displayed affect that is worried, planning to move to Columbia. Dr. Gutierrez assessed panic disorder, general anxiety disorder, major depressive disorder, "doing fine". He prescribed Remeron 45 mg, and Xanax.

On September 23, 2003, plaintiff returned to see Dr. Stone (Tr. at 137). "Neck pain has been worse lately. Patient's father-in-law had terminal lung cancer, and he fell out of bed the other day. Patient picked him up. . . . He knew this would increase his pain, and it did. Overall, however baseline control of pain is adequate." Assessed chronic neck pain exacerbated by recent physical activity.

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 38 of 70

"Baseline pain control is adequate." Associated muscle spasms, diazepam has been helpful for spasms. Refilled Diazepam, MS-Contin, and MSIR.

On October 17, 2003, plaintiff returned to see Dr. Stone (Tr. at 136). Plaintiff was complaining of neck pain and low back pain with tingling radiating into his right leg. Standing tends to make it worse. "Patient did have to do some lifting of his father-in-law who was dying of lung cancer." Complained that MS-Contin was not helping, needed to take two tablets for help with the pain. Cooler weather may be exacerbating the pain. "Patient is accompanied by his wife. She indicates that he has had problems lately with seizure activity. Patient is reluctant to discuss this at this time." Strength in left leg was 5/5, and was 4/5 in right leg. Assessed chronic neck pain. "Patient has been on the same dose of the MS-Contin for almost a year. Patient has probably exacerbated his chronic pain with the lifting he had to do of his late father-in-law." Dr. Stone prescribed Duragesic patches [used in combination with morphine for pain] and MSIR [morphine].

On October 23, 2003, plaintiff returned to see Dr. Stone (Tr. at 135). Plaintiff had been using the Duragesic patch. Complained they did not stick, and they caused

39

significant agitation. Plaintiff asked to try something else. Dr. Stone prescribed Dilaudid[2] every four to six hours, no more than four per day.

On October 31, 2003, plaintiff saw Jamey Wright, M.D., for MRI of cervical spine (Tr. at 118). Dr. Wright's impression was:

1. Mild spondylitic changes without tight central canal stenosis.

2. Right neuroforaminal stenosis at C3-4 due to asymmetric uncovertebral spur and disc bulge.

3. No focal disc protrusion.

On November 5, 2003, plaintiff returned to see Dr. Stone (Tr. at 134). "Patient has been finding the Dilaudid helpful. However, concerned that it only acts for one to two hours. By three hours he is definitely feeling like he needs more medicine. . . . Has ben using Valium for muscle spasms. . . . Does not want any kind of physical therapy evaluation for his neck. . . . Also, patient has a step son who is in trouble with the law again, and this adds greatly to the patient's aggravation and frustrations. He is concerned that he is going to be called for a court

---

[2]Narcotic analgesic used to treat pain.

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 40 of 70

appearance regarding the step son on the same day that his disability hearing is scheduled. He is very angry about this possibility." Dr. Stone continued plaintiff on Dilaudid but increased its frequency to every two to four hours as needed. He wrote the prescription for 150 tablets instead of 80.

On November 11, 2003, Nemesio E. S. Gutierrez, M.D., completed a Medical Assessment of Ability to do Work-Related Activities (Mental) (Tr. at 124-125). The form states, "To determine this individual's ability to do work-related activities on a day-to-day basis in a regular work setting, please give us an assessment - **BASED ON YOUR EXAMINATION** - of how the individual's mental/emotional capabilities are affected by the impairment(s)." (emphasis in the original) (Tr. at 124).

Dr. Gutierrez found that plaintiff had a fair ability to follow work rules, use judgment, function independently, and maintain attention/concentration (Tr. at 124). He found that plaintiff had poor to no ability to relate to co-workers, deal with the public, interact with supervisors, or deal with work stresses (Tr. at 124). When asked to "include the medical/clinical findings that support this assessment", Dr. Gutierrez wrote, "chronically suffers from

41

severe anxiety panic attacks and depression that limits his ability to function well." (Tr. at 124).

Dr. Gutierrez found that plaintiff had a good ability to understand, remember, and carry out complex, detailed, and simple job instructions (Tr. at 125). When asked to describe the medical/clinical findings that support this assessment, he wrote, "though he is able to carry out simple to complex instructions, his severe anxiety interferes with this in a significant way." (Tr. at 125).

Dr. Gutierrez found that plaintiff had a fair ability to maintain his personal appearance, but that he had a poor to no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability (Tr. at 125). When asked to describe the medical/clinical findings that support this assessment, Dr. Gutierrez wrote, "When having a stable period, is able to handle self well but these are few and far between." (Tr. at 125).

Finally, when asked to state any other work-related activities which are affected by the impairment, including the medical/clinical findings that support the assessment, Dr. Gutierrez wrote, "Has a history of working as a nurse, but stress of work, family, personal problems precipitates

worsening of anxiety which renders him useless." (Tr. at
125).

On November 20, 2003, plaintiff returned to see Dr.
Stone (Tr. at 133). "Patient is complaining of severe right
hip pain. Also continues with neck pain. Has had problems
with the right hip giving out on him. Had a fall at
Dunavant's recently. Gets symptoms where the right leg can
go numb on him. . . . Patient likes the Dilaudid better
than the MS-Contin and MSIR. Believes that it provides an
adequate pain relief without some of the grogginess of the
morphine."

Dr. Stone assessed right hip pain of unclear etiology.
"No injury recalled. Pain may be exacerbated by chronic low
back pain." Also assessed chronic neck pain "with overall
reasonable pain control results with Dilaudid." Dr. Stone
provided a refill of Dilaudid, and noted that plaintiff "has
his Disability hearing coming up in early December."

On November 24, 2003, plaintiff returned to see Dr.
Stone (Tr. at 132). The record reads as follows:

S:  Patient is seen at my request for clarification on
items in Disability form that I filled out initially on
11/04/03. [Timothy] Harlan, the patient's attorney
found some inconsistencies in the answers. I initially
filled out this form without Mr. Vaughn present.
Therefore I asked him to come to the office today for
us to fill this out together to make sure that I am

43

understanding his situation in the home setting. Reference also made to my previous physical exams, especially the Disability physical examination of 01/06/03 that was my most thorough exam of him. Reference also made to MRI of 10/31/03 and x-rays earlier this year. Mr. Vaughn describes that he is always uncomfortable with pain, despite high dose narcotic medication taken on a chronic basis. Pain medication does help somewhat. Frequently has to shift positions, cannot stay in any one position for more than about 20-30 minutes. He spends a lot of time at home in a recliner with heating pad that drapes around his neck and helps. Also tends to keep his feet elevated. Has had intermittent problems with ankle edema. This can be exacerbated with keeping feet down for a long time. Also gets problems with swelling and pain in his hands if he uses them for very long periods of time. Example is given of trying to sit at the computer for more than ten minutes, that he gets pain in the joints. Variety of movements such as climbing, balancing, stooping, kneeling, crouching, or bending tend to exacerbate either back or neck pain. Even simple reaching and handling things can pull at the muscles in the neck. Vibration and cold weather particularly aggravate the pain.

Assessment:
1.    Chronic neck pain that is debilitating. MRI done 10/31/03 shows degenerative changes with disk space narrowing. There is some central stenosis, though this appears not to cause any neurologic symptoms in the upper extremities.
2.    Chronic low back pain.
3.    Right hip pain. This has been a fairly recent complaint. May relate secondarily to chronic low back pain which causes an altered gait. X-rays pending on this.
4.    Pain and swelling with use of hands. Patient's strength of his hands is intact. The neck pain is not likely the underlying etiology for this pain and swelling. X-rays done of the hands on 01/09/03 showed no bony abnormalities. Back on 11/26/02 had an

44

elevated ESR[3] at 31.  ANA[4] and rheumatoid factor were
negative.
5.    The total of this patient's chronic pain is
greater than the sum of any one of its component parts.
This is primary reason for recommendation of total
disability.

Plan:
1.    Form filled out today.  Copy to be mailed back to
Mr. Harlan.  Mr. Harlan returned the original copy that
I filled out 11/04/03.  I am going to shred this copy.
Keeping the copy of the 11/04 note in the chart as part
of the permanent record, but with notation that the
form has been updated and revised.
2.    Continue with Dilaudid 8 mg p.o. [orally] q.
[every] 4 h. [hours] p.r.n. [as needed for] severe
pain.  No new prescription today.  When patient gets to
about a five or six day supply, he will contact me and
I will plan to seek authorization from the insurance
company for an increased quantity of this medication.
3.    Call or return to the office otherwise on a p.r.n.
[as needed] basis or as scheduled in approximately
three weeks.

(Tr. at 132).

Dr. Stone then completed a new Medical Source Statement
- Physical (Tr. at 129-131).  This time Dr. Stone found that
plaintiff could do no lifting.  He wrote, "strength is
intact, but use of hands more than 10 minutes causes pain in

─────────────────────

     [3]ESR (erythrocyte sedimentation rate) is a nonspecific
screening test for various diseases.  This one-hour test
measures the distance (in millimeters) that red blood cells
settle in unclotted blood toward the bottom of a specially
marked test tube.  This test is used to help diagnose
certain inflammatory conditions.

     [4]Antinuclear antibody test, helps diagnose lupus and
rule out other autoimmune diseases.

45

joints of the hands." He found that plaintiff could stand or walk for a total of two hours and for 20 to 30 minutes at a time. He wrote, "Mr. Vaughn always uncomfortable with pain, frequently having to shift position and weight. No one position more than 20-30 minutes." He found that plaintiff could sit for a total of three to four hours per day and for 20 to 30 minutes at a time. He wrote, "With feet down, gets ankle swelling [illegible] numbness. At home, usually in a recliner." Dr. Stone did not check "limited" or "unlimited" with regard to plaintiff's ability to push or pull. Rather, he wrote, "No foot controls. Greatly limited with hands due to pain in hands. At home spends a lot of time in recliner chair with a heating pad like a harness around neck."

He found that plaintiff can never climb, balance, stoop, kneel, crouch, or bend. He found that plaintiff is limited in his ability to reach, handle, finger, and feel. He found that plaintiff has restrictions against exposure to heights, machinery, vibration, and cold. He wrote, "Vibration and cold aggravate chronic pain. Cold exposure makes pain severe, despite the strong pain medications. Needs to avoid heights and machinery since any anticipated

46

need for quick movements would greatly exacerbate chronic pain."

When asked to describe the clinical and laboratory findings supporting his conclusions, Dr. Stone wrote, "Chronic muscle spasm and tenderness in the neck and low back. Intermittent swelling and pain in hands. Intermittent swelling in ankles. Pain in right hip. [illegible] MRI 10/31/03 degenerative changes, neuroforaminal changes C3-C4."

The form concludes with the following:

Does this Physical Ability Statement include consideration of pain, discomfort and/or other subjective complaints? [x] Yes

Would rest be helpful to the Patient? [x] Yes

Would any of the following be considered necessary to help the patient in regard to control of existing pain or fatigue?

1. Assuming a reclining position for up to 30 minutes, 1-3 times a day?
   [x] Yes "Several times a day. Sometimes sleeps overnight in recliner."
2. Assuming a supine position for up to 30 minutes 1-3 times a day?
   [x] No "Can aggravate pain. And has trouble getting up."
3. Propping up legs to a height of 2-3 feet, 1-3 times a day while sitting
   [x] Yes "Reduces ankle swelling."

(Tr. at 129-131).

47

### C. *SUMMARY OF TESTIMONY*

During the December 9, 2003, hearing, plaintiff testified as follows:

At the time of the hearing, plaintiff was 43 years of age (Tr. at 227). He has a GED, he took classes to become a certified nurse's assistant, and he took a class in pharmacology so he could give injections (Tr. at 227-228).

Plaintiff suffers from neck pain, and his hands swell (Tr. at 229). Plaintiff was taking morphine, but it stopped working so he was switched to Dilaudid (Tr. at 230). Plaintiff stated that the Dilaudid "works real well." (Tr. at 230). He has no side effects and tolerates the Dilaudid fairly well (Tr. at 230). At the time of the hearing, he had been taking narcotic pain relievers for four years (Tr. at 230).

Plaintiff is treated by Dr. Gutierrez for anxiety and depression (Tr. at 230). Plaintiff's wife and daughter do the cooking, cleaning and laundry (Tr. at 232). Plaintiff does all the family's driving because his wife does not drive (Tr. at 232). On a typical day, plaintiff drives his wife to the homes of her clients (she does home health care) (Tr. at 233-234). She works about four days a week anywhere from two to eight hours a day (Tr. at 235). Some of the

48

people live out of town, about 15 miles away (Tr. at 234).
He drives her to see four to five patients per day, drops
her off at their houses, then goes home, then returns to get
her and take her to the next house (Tr. at 235). He drives
to the grocery store, drives the kids where they need to go
(Tr. at 233-234). Plaintiff helps his three kids with their
homework (Tr. at 233). Plaintiff enjoys writing although he
can only write a little at a time (Tr. at 236). He is
unable to use his computer because of his hand problems (Tr.
at 236). Plaintiff cannot do any outside work anymore (Tr.
at 236).

Plaintiff previously worked as a security guard (Tr. at
235). The job involved just sitting or he could get up and
walk around (Tr. at 235-236).

### V. *FINDINGS OF THE ALJ*

Administrative Law Judge James Seiler issued his
opinion on June 25, 2004 (Tr. at 10-27).

Step one. The ALJ found that plaintiff had not engaged
in substantial gainful activity since his alleged onset date
of February 11, 2001 (Tr. at 10). He was first insured in
July 1996 and his last insured date is September 30, 2006
(Tr. at 10).

49

Step two.  The ALJ found that defendant has "the severe combination of cervical degenerative changes with chronic neck pain, a history of chronic low back pain, depression, recent complaints of right hip pain, and a medical history of diagnoses of panic attacks and a generalized anxiety disorder." (Tr. at 11).

Step three.  His severe impairments, however, do not meet or equal a listed impairment (Tr. at 11).

Step four.  After reviewing the medical evidence at length, the ALJ determined that plaintiff retains the residual functional capacity to frequently lift and carry ten pounds; occasionally lift and carry 20 pounds; and perform prolonged walking, standing, and sitting (Tr. at 25).  He found that plaintiff's mental impairment of anxiety and panic attacks is stable and not severe, and his depression is mild and imposes only mild limitations (Tr. at 25).

The ALJ then found that plaintiff can return to his past relevant work as a security guard, which mainly involved sitting, according to plaintiff (Tr. at 25-26).

Step five.  Alternatively, the ALJ found that plaintiff has the residual functional capacity to perform the full

50

range of light work according to the Medical-Vocational guidelines (Tr. at 26).

Therefore, plaintiff was found not disabled at step four of the sequential analysis and alternatively at step five.

## VI. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in relying on the findings of Dr. Runde, in discounting the opinion of Dr. Gutierrez, and in discounting the opinion of Dr. Stone. Dr. Gutierrez and Dr. Stone were treating physicians and Dr. Runde was a consultative physician.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment

51

relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

   **_Dr. Stone_**.  With regard to the above-listed factors, there is no question that plaintiff had an ongoing relationship with Dr. Stone.  The real factors at issue here are the supportability by medical signs and laboratory findings and the consistency of the opinion with the record as a whole.

   The ALJ recited at length the treatment records of Dr. Stone and how they consistently contradict his findings in the Medical Source Statement.  Specifically the ALJ noted that Dr. Stone found in January 2003 that plaintiff had a normal gait, a pleasant demeanor, was in no acute distress, his lumbar and thoracic spine were non-tender, plaintiff had no particular limitation of physical activity, and his low back pain was moderate and not significantly disabling (Tr. at 14).  Dr. Stone relied heavily on that particular examination when he completed the Medical Source Statement finding that plaintiff can basically do nothing at all.  I find that the evidence supports the ALJ's finding that the Medical Source Statement of Dr. Stone is contradicted by his

52

own treatment records, the other credible evidence in the record, and plaintiff's own activities.

First I note that Dr. Stone completed a Medical Source Statement on November 4, 2003, which never made it into the record. According to Dr. Stone's November 24, 2003, treatment record, his November 4 Medical Source Statement was inconsistent and as a result was returned to him by plaintiff's attorney. Dr. Stone then shredded that Medical Source Statement and completed a new one, the one at issue here. In this new Medical Source Statement, plaintiff was present to assist Dr. Stone in completing the Medical Source Statement (plaintiff had not been present when the shredded version was prepared).

Dr. Stone found that plaintiff could lift no weight at all. He found that plaintiff can stand or walk for a total of two hours and for 20 to 30 minutes at a time. He found that plaintiff can sit for a total of three to four hours and for 20 to 30 minutes at a time. He found that plaintiff could not push or pull with his feet and is greatly limited in the use of his hands. He found that plaintiff can never climb, balance, stoop, kneel, crouch, or bend. He found that plaintiff is limited in his ability to reach, handle,

53

finger, and feel.  Finally, he found that plaintiff cannot
work around heights, machinery, vibration, or cold.

In addition to those findings, Dr. Stone noted that
plaintiff needs to recline for 30 minutes one to three times
per day and that he needs to prop his legs up one to three
times per day while sitting.

By comparison, the ALJ found that plaintiff has the
following abilities:

He can occasionally lift and carry 20 pounds and can
frequently lift and carry ten pounds; and he can sit, walk,
and stand without limitation.

Dr. Stone's findings in his Medical Source Statement
are not supported by anything in the record and are clearly
contradicted by his own treatment records and plaintiff's
activities since his alleged onset date.  In February 2001,
after plaintiff's alleged onset date, Dr. Stone wrote that
plaintiff can return to work in a light capacity lifting 20
pounds maximum.  He said that plaintiff could stand or walk
for six to eight hours each day and could use his hands for
single grasping, fine manipulation, pushing, and pulling.

On February 26, 2001, Dr. Stone noted plaintiff was in
no cute distress, his pain control regimen was adequate, his
depression was improved.  He recommended further education

54

or retraining, finding that plaintiff could still "be a productive member of the work force."

In March 2001, plaintiff had been chopping wood. That is clearly inconsistent with an inability to lift anything and an ability to stand for only 20 minutes at a time.

In April 2001, Dr. Stone noted that plaintiff was in no acute distress. In May 2001, plaintiff stated that he could handle the family stressors on his own. On May 31, 2001, Dr. Stone stated that plaintiff should try to find another line of work so he would not have to do heavy lifting. He noted that plaintiff's pain was controlled fairly adequately.

In July 2001, plaintiff had been moving his family to Fulton, and was moving items himself. He also pushed his car out of the garage when it caught on fire. Again, this is completely inconsistent with an inability to do any lifting or to stand and walk for only 20 minutes at a time. Dr. Stone found that plaintiff's pain control was adequate. He encouraged him to go by a college library to look at counseling books to help him pick a new job.

In August 2001, plaintiff had been interviewing for several jobs which involved lifting. Dr. Stone found that plaintiff's depression was overall stable.

In October 2001, plaintiff stated that he was enjoying doing wood work and was considering making coffee tables to sell. Again, this is entirely inconsistent with an inability to lift anything. Dr. Stone found plaintiff in no acute distress and his depression was improved.

In February 2002, Dr. Stone assessed plaintiff's neck pain as stable and noted that the pain medication regimen was generally helpful. He wrote that the pain, according to plaintiff, was not as intolerable as it had been in the past. He had no swelling in his extremities, he had a normal gait, his neck pain was adequately controlled, and his muscle spasm was controlled with Valium.

In March 2002, plaintiff was in no acute distress. In May 2002, Dr. Stone noted that plaintiff's neck pain control was satisfactory. Plaintiff was in no acute distress.

In July 2002, plaintiff was doing construction work. This is entirely inconsistent with an inability to lift anything or to stand or walk for no more than 20 minutes at a time. Dr. Stone found plaintiff in no acute distress.

In August 2002, plaintiff was trying to get a new job that only required light lifting on an occasional basis. Plaintiff's attempt to secure this position is inconsistent with an inability to lift anything. Dr. Stone encouraged

56

plaintiff to find a job that was not as physically demanding as his past jobs. Dr. Stone's encouraging plaintiff to find a less strenuous job is entirely inconsistent with his finding that plaintiff is disabled.

In September 2002, plaintiff was doing sheet rock work which required lifting. He was also trying to secure several jobs in Columbia, one of which required lifting 50 to 100 pounds. Again, this behavior is inconsistent with an inability to lift anything.

In early October 2002 Dr. Stone noted that plaintiff was pleasant, in no acute distress, and his neck pain was well controlled. At the end of October 2002, Dr. Stone stated that plaintiff's medications were overall fairly helpful, plaintiff was pleasant and in no acute distress, he had no swelling in his hands or ankles, and his neck pain was overall reasonably controlled.

In November 2002, plaintiff was doing moderate physical labor, was washing windows and was painting for his landlord. This is inconsistent with Dr. Stone's findings that plaintiff can do no lifting, can do no reaching, can stand or walk for no more than 20 minutes, and cannot work in the cold (I assume the windows were being washed on the outside since it was for the landlord, and it can be rather

57

cold in November).  Dr. Stone remarked that plaintiff would
be an "excellent candidate for Vocational Rehabilitation
that would give him skills to work in non-physically
demanding ways."  This is inconsistent with his finding that
plaintiff is totally disabled.

In December 2002, Dr. Stone remarked that plaintiff's
neck pain was the same, his medications were helping, and
his chronic neck pain was adequately controlled.

In January 2003, Dr. Stone noted that plaintiff's low
back pain does not contribute to his disability situation,
that he had no problems with swelling of his hands and feet,
and that he has no particular limitation in physical
activity.  This is inconsistent with Dr. Stone's finding
that plaintiff can do no lifting; that he can only sit,
stand, or walk for 20 minutes at a time; that he must
recline with his feet elevated several times per day due to
swelling in his feet; that he can never climb, balance,
stoop, kneel, crouch, or bend; and that he is limited in his
ability to reach, handle, finger, and feel.  "No particular
limitation in physical activity" cannot reasonably lead to
the conclusion that plaintiff is so severely limited as
stated in Dr. Stone's Medical Source Statement.  In
addition, I note that Dr. Stone specifically stated that he

relied heavily on the January 2003 exam in completing the Medical Source Statement as it was his most thorough exam of plaintiff.

In late January 2003, Dr. Stone noted that plaintiff's medications were helpful and that plaintiff denied any particular depression symptoms. He found plaintiff generally pleasant and in no acute distress. He found "probable mild depression".

In February 2003, Dr. Stone noted that plaintiff was pleasant and in no acute distress. In March 2003, plaintiff commented that he suffers more pain when he drives more than 20 miles. Even opening a car door and lifting keys to place in the ignition is more lifting than Dr. Stone found plaintiff was capable of doing in his Medical Source Statement. Dr. Stone commented in February 2003 that plaintiff was generally healthy, pleasant, and in no cute distress.

In April 2003, plaintiff was finding acupuncture significantly helpful. Plaintiff was generally healthy, pleasant, and in no acute distress.

In May 2003, Dr. Stone noted that plaintiff was generally healthy, in no acute distress, his chronic neck

59

pain was overall stable, and his medications were providing overall satisfactory relief.

In June 2003, plaintiff noted that he was out of town in the Kansas City area.  This type of traveling is inconsistent with Dr. Stone's findings that plaintiff can sit for no more than 20 minutes at a time.

In August 2003, Dr. Stone noted that plaintiff's pain medications were generally helpful for the most part, his neck pain was adequately controlled, and his anxiety was stable.

In September 2003, plaintiff picked his father-in-law up off the floor when he fell out of bed.  This is inconsistent with an inability to lift anything.  Dr. Stone found that plaintiff's pain control was adequate.

In November 2003, Dr. Stone noted that plaintiff found Dilaudid helpful.  That same month Dr. Stone noted that plaintiff had overall reasonable pain control results for his neck.

At the hearing in December 2003, plaintiff testified that the Dilaudid "works real well" and he has no side effects from that medication.  He testified that he drives his wife to the homes of her patients up to four days per week, up to eight hours per day, and up to 15 miles away.

60

He does all the family driving including driving to the grocery store and driving his kids to their school functions.

As the ALJ adequately pointed out, there is nothing in the record to support the extreme limitations found by Dr. Stone in his Medical Source Statement. Dr. Stone's treatment records indicate fair control of plaintiff's pain over several years, they indicate that plaintiff was able to do very strenuous activity on a regular basis albeit with some pain afterward. There is nothing in Dr. Stone's treatment records, in any other treatment records, or in plaintiff's own daily activities which support, even remotely, the extreme limitations recorded in Dr. Stone's Medical Source Statement. For example, Dr. Stone stated that plaintiff needs to recline with his feet elevated multiple times per day due to swelling in his feet. The records actually reflect that plaintiff, on one occasion, stated that he had to spend time in his recliner due to reflux disease, not due to swelling in his feet. Plaintiff rarely complained of swelling. On one occasion, he suffered swelling due to buying boots that were too tight. On another occasion he claimed to have had swelling, but it was resolved by the time he got to the doctor's office. Therefore, the

61

substantial evidence in the record supports the ALJ's decision to give little if any weight to the Medical Source Statement of Dr. Stone.

***Dr. Gutierrez***.  The record contains only two treatment records[5] by Dr. Gutierrez before he completed the Medical Assessment of Ability to do Work-Related Activities Mental ("Medical Assessment") on November 11, 2003.  In the Medical Assessment, Dr. Gutierrez had no ability to relate to co-workers, deal with the public, interact with supervisors, or deal with work stresses.  He found that although plaintiff can carry out simple to complex instructions, his "severe anxiety interferes with this in a significant way."  He found that plaintiff has no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability.  Finally, Dr. Gutierrez stated that plaintiff's work, family, and personal problems worsen his anxiety and render him "useless".

---

[5]As listed in the section on Administrative Records, the ALJ wrote a letter to plaintiff's counsel on January 9, 2004, stating that the ALJ was expecting to receive office notes from Dr. Stone and Dr. Gutierrez but had not received those as of that date.  It appears from the record that Dr. Stone's treatment records were submitted, but it appears that Dr. Gutierrez's records were not supplemented.

In assessing Dr. Gutierrez's opinion as reflected in the Medical Assessment, the ALJ pointed out that just two months before the Assessment was completed, Dr. Gutierrez noted that plaintiff was doing fine, he was happy with things at home, he was taking care of his children, his mood was good and his affect was full, and he was readying for a move to Columbia. He pointed out that Dr. Gutierrez's treatment notes do not reflect ongoing anxiety. He also pointed out that Dr. Stone's treatment records reflect improved, controlled, or stable depression and stable anxiety helped by Xanax. The ALJ also noted an absence of treatment for frequent complaints of uncontrollable anxiety or panic attacks. He noted that Dr. Runde found plaintiff suffered from only a mild mood disorder, and that plaintiff's frequent work and applying for myriad jobs is inconsistent with being "useless".

Based on a review of the record, I find that the substantial evidence in the record supports the ALJ's decision to give little if any weight to Dr. Gutierrez's Medical Assessment and to give more weight to his treatment notes which are consistent with the other credible evidence in the record.

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 63 of 70

On August 18, 2003, plaintiff saw Dr. Gutierrez who wrote in the treatment notes that plaintiff had last come in on March 10, 2003 (a record for that date is not in this file). There is no indication on August 18, 2003, that Dr. Gutierrez performed any tests. Rather, he noted that plaintiff had applied for disability and then assessed panic disorder, general anxiety disorder, and major depressive disorder. He prescribed Remeron. A month later, on September 18, 2003, plaintiff saw Dr. Gutierrez who found that plaintiff was taking care of his kids, was happy with things at home, was getting along with his wife, had a good mood, full affect, and was planning to move to Columbia. Dr. Gutierrez stated that plaintiff was "doing fine". He kept plaintiff on his Remeron and Xanax.

With that backdrop, we move to November 11, 2003, when Dr. Gutierrez found plaintiff useless. Although the form states that the opinion should be "**BASED ON YOUR EXAMINATION**", and asks for medical/clinical findings which support the conclusions, Dr. Gutierrez provided nothing more than plaintiff's own subjective allegations. He wrote that plaintiff "chronically suffers from severe anxiety, panic attacks and depression that limits his ability to function well." However, there are no records of chronic severe

anxiety or panic attacks, and there are no records of chronic depression that limits plaintiff's ability to function. On the contrary, Dr. Gutierrez's own notes from less than two months earlier state that plaintiff was doing fine and was happy. Dr. Stone repeatedly, over a multiple-year period, noted that plaintiff's depression and anxiety were controlled, stable, and mild. Plaintiff declined counseling, he stated that he could handle his stressors on his own, and he denied symptoms of depression.

Dr. Gutierrez wrote that although plaintiff can carry out complex instructions, "his severe anxiety interferes with this in a significant way." Not only is this not a medical/clinical finding, it is completely conclusory and unsupported by anything in the record. Again, the record consistently refers to plaintiff's anxiety as mild or controlled. There is no evidence in this record that plaintiff suffers from severe anxiety or that any mental health issue interferes with his ability to carry out instructions. In fact, the record is replete with instances of plaintiff painting, washing windows, doing carpentry, doing sheet rock work, etc., which clearly shows that he is capable of carrying out instructions without interference from severe anxiety.

65

Dr. Gutierrez wrote, "When having a stable period, is able to handle self well but these are few and far between." Again, there is no evidence anywhere in the record to support such a finding. Plaintiff's stable periods, according to the records of Dr. Gutierrez and Dr. Stone, were fairly constant.

Finally, Dr. Gutierrez's statement that the stress from work, family, and personal problems renders plaintiff useless is again unsupported by anything in the record. Plaintiff has been able to do carpentry, wood working, sheet rock work, painting, window washing, moving households, roll a car out of the garage, look for jobs, attend Vocational Rehabilitation, take drafting classes, research vocations, take care of his children, attend school functions, play baseball with his children, drive his wife from one client's home to another on a regular basis, and do the grocery shopping, all while dealing with the stresses of work, family, and personal problems. This is hardly evidence of being useless.

There are no medical findings and no test results in Dr. Gutierrez's records (or anywhere else) which support his findings in the Medical Assessment. Therefore, I find that

66

the ALJ properly discounted his opinion as reflected in the Medical Assessment.

**_Dr. Runde_**.  Plaintiff argues that the ALJ erroneously relied on the opinion of Dr. Runde, who was not a treating physician and who also had not reviewed plaintiff's MRI. The ALJ noted that Dr. Runde's examination included the Oswestry Low Back Pain Disability Questionnaire which revealed complaints of low back pain comprised 60% of disability despite the fact that most of plaintiff's pain is within his neck.  The validity of the test was considered inadequate.  Plaintiff had 5/5 upper extremity strength with only fair effort.  Plaintiff had 4/5 grip strength despite inconsistent and poor effort.  He reported left shoulder pain in one position but not in other positions making it more challenging to attribute the poor effort to any form of pain.  Plaintiff's other test results indicated that he was not using good effort during the static grip testing.  The Beck Depression Inventory revealed only mild mood disturbance.

Dr. Runde noted subjective complaints greater than objective findings, probable deconditioning and possible narcotic and benzodiazepine dependence.  This finding is supported by Dr. Stone's notes wherein he comments that he

67

and Dr. Gutierrez were unknowingly prescribing multiple
benzodiazepine medications which could have resulted in an
overdose if used improperly.

The ALJ may credit a one-time consultant and discount a
treating physician's opinion when the one-time medical
assessment is supported by better or more thorough medical
evidence, or where a treating physician renders inconsistent
opinions that undermine the credibility of those opinions.
Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003). In
this case, Dr. Runde's opinion is supported by test results,
and the opinions of Dr. Stone and Dr. Gutierrez are
inconsistent with their treatment notes and those
inconsistencies undermine the credibility of those opinions.

Dr. Runde's findings that plaintiff can lift 25 pounds,
push and pull, climb, balance, stoop, kneel, and crouch are
consistent with the treatment notes of Dr. Stone, including
all of the evidence of other activities performed by
plaintiff, such as carpentry, sheet rock work, painting,
etc. Therefore, I find that the substantial evidence in the
record supports the ALJ's decision to give significant
weight to the findings of Dr. Runde.

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 68 of 70

***RFC Assessment***.

The ALJ must determine a claimant's residual functional capacity based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's credible description of his limitations.  <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000).  The ALJ properly found plaintiff not entirely credible and plaintiff has not challenged that finding.  The medical records do not support the findings of Dr. Stone in his Medical Source Statement or of Dr. Gutierrez in his Medical Assessment.

The medical evidence does, however, support the ALJ's residual functional capacity assessment.  His findings are consistent with the findings of Dr. Runde, with the activities performed by plaintiff[6] throughout the several year period at issue, and with the treatment records of plaintiff's treating physicians.

---

[6]This is not to say that plaintiff's ability to do carpentry on occasion is evidence that he can do carpentry on a regular basis.  I mean only to point out that these activities are significantly greater than the limitations listed in Dr. Stone's Medical Source Statement and Dr. Gutierrez's Medical Assessment, which discredits those opinions and lends support to the decision of the ALJ on this issue.

Case 2:04-cv-04246-REL   Document 22   Filed 09/08/05   Page 69 of 70

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VII. CONCLUSIONS

I find that the substantial evidence in the record supports the ALJ's decision to discount the opinion of Dr. Stone in his Medical Source Statement, to discount the opinion of Dr. Gutierrez in his Medical Assessment, and to rely on the opinion of Dr. Runde. I also find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 8, 2005